UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVSION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br>　　v.<br>JOSE MORENO-GOMEZ,<br>　　　　Defendant. | Case No. 5:14-cr-00460 EJD<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INFORMATION**<br><br>Re: Dkt. No. 18 |

　　　　Defendant Jose Moreno-Gomez ("Moreno-Gomez") moves to dismiss an Information charging him with one count of illegal reentry after deportation in violation of 8 U.S.C. § 1326. See Docket Item No. 18.  Plaintiff United States of America (the "Government") opposes the motion. See Docket Item No. 24. Having carefully considered the pleadings and the arguments of counsel presented at the hearing on November 24, 2014, Defendant's motion will be granted for the reasons explained below.

**I.　BACKGROUND**

　　　　Moreno-Gomez entered the United States from Mexico in approximately 1976 to join his parents. See Decl. of Jose Moreno-Gomez ("Moreno-Gomez Decl."), Docket Item No. 20, at ¶ 2. He was 12 years old at the time. Id.  In 1983, Moreno-Gomez became a legal permanent resident and filed a Petition for Naturalization in 1986. Id. at ¶ 6; see also Decl. of Cynthia C. Lie ("Lie Decl."), Docket Item No. 22, at Ex. C.  He never completed the naturalization process, however. See Moreno-Gomez Decl., at ¶ 6.

　　　　Moreno-Gomez has 10 siblings, one of whom was born in the Unites States. Id.  His other siblings entered the United States at or before the time he entered and have resided continuously in the United States since their entry. Id.  According to Moreno-Gomez, all members of his

immediate family have been legal residents since the 1990s. Id. Members of his extended family, including aunts, uncles and cousins, have also resided legally in the United States since the 1990s, either as citizens or legal permanent residents. Id. at ¶¶ 3, 4.

After entering the United States, Moreno-Gomez settled in Watsonville and began working in the agricultural industry. See Lie Decl., at Ex. C; see also Moreno-Gomez Decl., at ¶ 5; see also Decl. of Dolores Abundiz, Docket Item No. 21, at ¶ 3. He also worked as a cook for his brothers' food-service businesses during his off-hours. See Moreno-Gomez Decl., at ¶ 5; see also Abundiz Decl., at ¶ 3. Between these two jobs, Moreno-Gomez often worked 60 hours per week. See Moreno-Gomez Decl., at ¶ 5. He married Dolores Abundiz, a United States citizen, in 1982. See Abundiz Decl., at ¶ 1. They have six children, all of whom were born in the United States between 1982 and 1996. Id. at ¶ 2.

In or about November, 1991, a criminal complaint was filed in Monterey County Municipal Court charging Moreno-Gomez and his brother, Federico Moreno-Gomez, with multiple violations of California Health and Safety Code §§ 11351 (possession or purchase of cocaine for sale) and 11352 (transportation of cocaine for sale). See Lie Decl., at Ex. D. Moreno-Gomez was also charged with a firearm enhancement pursuant to California Penal Code § 12022(c). Id. He was held to answer the charges after a preliminary examination and an Information was filed in Monterey County Superior Court on January 3, 1992.[1] Id. He ultimately

---

[1] Prior to the unification of the California courts:

> [U]nless the prosecution elected to seek an indictment before a grand jury, felony proceedings were commenced with the filing of a complaint in municipal court before a magistrate. . . . The magistrate then was required to set a date for the preliminary examination. At the conclusion of the preliminary examination, the magistrate determined whether there was sufficient cause to hold the defendant to answer on a felony charge. If the defendant was held to answer on a felony charge following the preliminary examination, the prosecution filed an accusatory pleading - an information - in superior court, charging the defendant with the felony offense. When the information was filed, the defendant was arraigned on the charges in superior court.

1   plead guilty to three § 11352 violations and was sentenced on March 12, 1992, to three concurrent

2   four-year terms with one consecutive four-year term for the § 12022(c) enhancement. Id.

3         Due to his state conviction, deportation proceedings were initiated against Moreno-Gomez

4   by an Order to Show Cause ("OSC") dated August 4, 1993. Id. at Ex. B.  He was alleged to have

5   committed a controlled substance offense and an aggravated felony, and was charged as

6   deportable under §§ 241(a)(2)(B)(i) and 241(a)(2)(A)(iii) of the Immigration and Nationality Act

7   ("INA"). Id.  He appeared for a hearing before an Immigration Judge ("IJ") on October 31, 1996,

8   while still incarcerated at Calipatria State Prison. Id. at Ex. A.  The IJ sustained the charges

9   alleged in the OSC, found that Moreno-Gomez was ineligible for relief from deportation, and

10  ordered Moreno-Gomez deported to Mexico. Id. at Exs. A, E.  Moreno-Gomez waived his right to

11  appeal from the deportation order. Id.  He was released from state custody on November 19,

12  1996, after serving four years and ten months and deported that same day. Id. at Ex. F.

13        In 2000, the 1996 deportation order was reinstated after Moreno-Gomez was found to have

14  re-entered the United States without authorization. Id. at Ex. G; see also Decl. of Courtney Norris

15  ("Norris Decl."), Docket Item No. 25, at ¶ 2.  As a result, he was deported for a second time on or

16  about June 29, 2000. See Norris Decl., at ¶ 2.

17        On or about July 11, 2014, Moreno-Gomez was found in Santa Cruz where he came to the

18  attention of United States immigration authorities following an arrest for driving under the

19  influence and failing to stop his vehicle at a crosswalk. Id.  The Information underlying this case

20  was subsequently filed on September 2, 2014. See Docket Item No. 7.

21  **II.   LEGAL STANDARD**

22        As a predicate to a conviction under 8 U.S.C. § 1326, "the Government must establish that

23  the defendant 'left the United States under order of exclusion, deportation, or removal, and then

24  illegally reentered.'" United States v. Raya-Vaca, No. 13-50129, 2014 U.S. App. LEXIS 21374,

25  at *11, 2014 WL 5802287 (9th Cir. Nov. 10, 2014) (quoting United States v. Barajas-Alvarado,

---

People v. Crayton, 28 Cal. 4th 346, 360 (2002) (internal citations omitted).

3
Case No.: 5:14-cr-00460 EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INFORMATION

United States District Court
Northern District of California

655 F.3d 1077, 1079 (9th Cir. 2011)).

Consequently, a defendant charged with a violation of § 1326 may, as a matter of due process, collaterally attack a predicate deportation order prior to trial. United States v. Pallares-Galan, 359 F.3d 1088, 1095 (9th Cir. 2004). In doing so, the defendant must show that: (1) he exhausted the administrative remedies available for seeking relief from the predicate order; (2) the deportation proceedings "improperly deprived" him of an opportunity for judicial review; and (3) the order was "fundamentally unfair." 8 U.S.C. § 1326(d). A deportation order is "fundamentally unfair" if it resulted from proceedings that violated the defendant's due process rights and caused prejudice. Raya-Vaca, 2014 U.S. App. LEXIS 21374, at *11-12. "[W]here a deportation proceeding violates an alien's due process rights, the Government may not rely on any resulting deportation order as proof of an element of a criminal offense." United States v. Leon-Leon, 35 F.3d 1428, 1431 (9th Cir. 1994).

### III. DISCUSSION

Moreno-Gomez believes the 1996 deportation order cannot be used as a predicate to this § 1326 prosecution.[2] The court agrees.

#### A. The Deportation Order was Fundamentally Unfair

##### i. Moreno-Gomez's Due Process Rights were Violated at the Deportation Hearing

Looking first at the "linchpin" issue of fundamental unfairness, Moreno-Gomez argues the 1996 proceedings violated his due process rights because the IJ mistakenly determined he was ineligible for relief from deportation and, because of that, failed to advise him of possible relief under § 212(c) of the INA. The Government disagrees, claiming that the IJ was correct in advising Moreno-Gomez that he was ineligible for any relief from deportation since, by the date of the deportation hearing, § 212(c) had been amended in such a way so as to exclude aliens like

---

[2] The Government also cites to the 2000 deportation in the Information. But since the basis for that removal was a reinstatement of the 1996 deportation order, the two must stand or fall together. See United States v. Arias-Ordonez, 597 F.3d 972, 981 (9th Cir. 2010) ("[A] valid reinstatement of a invalid removal order cannot transform the prior order into a valid predicate for an illegal reentry conviction.").

4
Case No.: 5:14-cr-00460 EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INFORMATION

Moreno-Gomez from its purview.

To resolve this issue, the court must determine which version of § 212(c) the IJ should have applied to Moreno-Gomez. There are two possibilities. The first was in existence in 1992 when Moreno-Gomez pled guilty in state court and had been in effect since 1990. That version provided:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) of this section (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 1181(b) of this title. The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

8 U.S.C. § 1182(c) (1995).

The second possibility came into effect before Moreno-Gomez's deportation hearing in October, 1996. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, removed the phrase "has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years" and replaced it with a broad set of offenses for which convictions would preclude § 212(c) relief. See 110 Stat. 1277 (amending 8 U.S.C. § 1182(c)). Notably absent from the amended version was any temporal statement concerning punishment; the 5-year imprisonment qualification was not replaced. As a result, all aliens convicted of an aggravated felony appeared to be excluded from § 212(c) relief after AEDPA.

Here, the IJ relied on the post-AEDPA version of § 212(c) to conclude that Moreno-Gomez was ineligible for relief.[3] While such reliance is understandable given the AEDPA

---

[3] The IJ stated, in relevant part: "Based on your responses and the status of the current law as it relates to this conviction you're not eligible for relief. I order you deported." See Lie Decl., at Ex. A.

amendment, it was nonetheless a violation of Moreno-Gomez's right to due process in light of Immigration and Naturalization Service v. St. Cyr, 533 U.S. 289 (2001).

In St. Cyr, the Supreme Court held that the repeal and revision of § 212(c) implemented pursuant to another set of legislation, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), should not be used to deprive an alien of the possibility of § 212(c) relief when that alien plead guilty to a crime prior to IIRIRA's enactment. 533 U.S. 289, 322-23. St. Cyr, a citizen of Haiti, had been admitted to the United States as a lawful permanent resident but pled guilty on March 8, 1996, to selling a controlled substance in violation of Connecticut law. Id. at 293. The conviction made St. Cyr deportable, but he qualified for discretionary relief under § 212(c) at the time. Id. However, when his deportation proceedings subsequently commenced on April 10, 1997, IIRAIRA had become effective and significantly narrowed the class of inadmissible or deportable aliens subject to a cancellation of removal. Id. at 293, 297. In addition, the Attorney General interpreted the IIRAIRA amendments as entirely terminating his discretion to grant a waiver for any alien previously convicted of an aggravated felony. Id.

As framed by the Court, its task was to determine "the impact of the [IIRAIRA] amendments on conduct that occurred before their enactment and on the availability of discretionary relief from deportation." Id. at 292. On that issue, the Court concluded there should be no impact on aliens like St. Cyr out of fairness concerns. The Court reasoned that without any clear basis to apply IIRAIRA retroactively, "it would surely be contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations,' to hold that IIRIRA's subsequent restrictions deprive them of any possibility of" § 212(c) relief. Id. at 323-24 (quoting Landgraf v. USI Film Products, 511 U.S. 244, 270 (1994)). This was so because "as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions" when entering into a plea agreement with the government. Id. at 322. To suddenly alter that calculus would be, as the Court described it, "an obvious and severe retroactive effect." Id. at 325.

Although it analyzes a different statute, St. Cyr applies with equal force here. When Moreno-Gomez pled guilty in 1992, he, like St. Cyr, must have been "acutely aware" of two consequences: (1) that he would become subject to deportation because his crimes were "aggravated felonies,"[4] but (2) that he would be eligible for § 212(c) relief so long as he served less than 5 years. See id. at 314-15, 322. He must have also known that, despite the 8-year sentence imposed, he could ultimately serve less than 5 years if he conducted himself properly and accumulated sufficient "good time" and "work time" credits while incarcerated. See Cal. Pen. Code § 4019. Accordingly, inasmuch as the IIRAIRA amendments could not be applied to "sweep away" St. Cyr's "settled expectations," the AEDPA amendment removing the 5-year imprisonment qualification should not have been applied to sweep away those of Moreno-Gomez. In the end, Moreno-Gomez did serve less than 5 years and should have been advised of the potential for § 212(c) relief since he otherwise qualified for consideration under the statute.[5]

The Government attempts to distinguish this case from St. Cyr by arguing that Moreno-Gomez could not have relied on eligibility for § 212(c) relief when he plead guilty to three felony counts and was sentenced to 8 years. This argument is unpersuasive for two reasons. First, it ignores the plain language of the pre-AEDPA version of § 212(c) by focusing on time sentenced rather than time served. See Corpuz v. Holder, 697 F.3d 807, 813-14 (9th Cir. 2012). Second, it is inconsistent with the realities of criminal plea bargaining and sentencing. Criminal defendants do not agree to plead guilty without some meaningful benefit, and as the Supreme Court recognized in St. Cyr, the most meaningful benefit for defendants like Moreno-Gomez is the

---

[4] Moreno-Gomez argues his § 11352 convictions should not be considered aggravated felonies based on Ninth Circuit opinions filed after his 1996 deportation hearing – even though the Ninth Circuit considered § 11352 violations to be aggravated felonies at that time of his guilty plea. See United States v. Lomas, 30 F.3d 1191, 1193 (9th Cir. 1994), overruled by United States v. Rivera-Sanchez, 247 F.3d 905 (9th Cir. 2001) (en banc). The issue underlying that argument – whether or not a different statutory interpretation should be applied retroactively – need not be resolved here because Moreno-Gomez would be eligible for § 212(c) under this analysis even if the § 11352 convictions are aggravated felonies.

[5] Moreno-Gomez's 7 years of consecutive residency is undisputed. In addition, Moreno-Gomez had not served 5 years at the time of the deportation hearing, and coincidentally was released from state custody approximately 3 weeks later.

preservation of a possibility for deportation relief.  533 U.S. at 322-23.  Here, although there was not a negotiated sentence reduced to writing, the circumstantial evidence from the state criminal proceedings and the reasonable inferences that arise therefrom make it plausible that Moreno-Gomez pled to the counts that he did in reliance on the potential for § 212(c) relief, even if he was sentenced to more than 5 years.  Indeed, it is no secret that lower-level criminal defendants in California do not often serve the entirety of their sentence given the statutory potential for work and conduct credits, and it is not a stretch to believe that Moreno-Gomez knew that.  The authorities cited by the Government, such as United States v. Velasco-Medina, 305 F.3d 915 (9th Cir. 2002), United States v. Lopez-Velasquez, 629 F.3d 894 (2010), and An Na Peng v. Holder, 673 F.3d 1248 (9th Cir. 2012), are each distinguishable and do not compel a different conclusion.

Without explicitly doing so, the Government advocates for retroactive application of the AEDPA amendment to §212(c).  But the Government has not cited to a clear indication that Congress meant AEDPA to be applied in that way.  In addition, as the court has explained, the effect of the AEDPA amendment on Moreno-Gomez would be "obvious" and "severe."  For these reasons, the court finds the IJ violated Moreno-Gomez's due process rights at the 1996 hearing by not advising him of eligibility for relief from deportation under § 212(c).

### ii. Moreno-Gomez was Prejudiced by the Due Process Violation

In addition to identifying a due process violation, Moreno-Gomez must also establish that he suffered prejudice from the ensuing deportation.  See Raya-Vaca, 2014 U.S. App. LEXIS 21374, at *23 (citing United States v. Jimenez-Marmolejo, 104 F.3d 1083, 1085-86 (9th Cir. 1996)).  This requires that he show "plausible grounds for relief" under § 212(c).  Id.  Assessing whether he could have done so is a two step process.  Id. at *24.  At the first step, the court must identify the factors relevant to an exercise of discretion under § 212(c).  Id.  At the second step, the court determines whether Moreno-Gomez's unique circumstances make out a plausible claim for relief under the relevant factors.  Id. at *24-25.  When assessing plausibility, the court is mindful of Moreno-Gomez's burden: he "need only establish 'some evidentiary basis on which relief could have been granted.'"  Id. at *27.  This is something more than theoretical possibility but less than

absolute certainty.  Id.

Under § 212(c), "there must be a balancing of the social and humane considerations presented in an alien's favor against the adverse factors evidencing his undesirability as a permanent resident."  Matter of Edwards, 20 I. & N. Dec. 191, 195 (BIA 1990).  "Favorable considerations have been found to include such factors as family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the [alien] and his family if deportation occurs, service in this country's armed forces, a history of employment, the existence of property or business ties, evidence of value and service to the community, proof of genuine rehabilitation if a criminal record exists, and other evidence attesting to . . . good character."  Id.  Adverse factors include "the nature and underlying circumstances of the exclusion or deportation ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of . . . bad character or undesirability as a permanent resident of this country."  Id.[6]

With these factors as a guide, the court finds that Moreno-Gomez could have made a plausible claim for §212(c) relief.  Although substantial negative equities arise from Moreno-Gomez's criminal convictions, the favorable equities are even more substantial.  He had moved to the United States in 1976 at a young age to join other members of his family, obtained legal status, and then lived here continuously for 15 years before his 1991 arrest.  His family ties were many and included Abundiz, a citizen, and their six children, all of whom would have undeniably experienced hardship from the deportation of their husband and father.  In contrast, his familial

---

[6] Since Moreno-Gomez's record does not reflect a pattern of serious criminal activity, he need not meet the heightened standard requiring "unusual or outstanding equities" when demonstrating plausibility.  See United States v. Gonzalez-Valerio, 342 F.3d 1051, 1056-57 (9th Cir. 2003) (applying "outstanding equities" standard when alien had convictions for multiple crimes, including lewd acts on a child, spousal abuse, and resisting arrest).  The unpublished case cited by the Government, United States v. Almaraz-Luevano, 544 Fed. Appx. 782 (9th Cir. 2013), is inapposite.  Unlike Moreno-Gomez, Almaraz-Luevano "had been convicted of four crimes in the five years preceding his 1997 removal proceeding, including three felony convictions, one of which occurred just weeks before his removal proceeding."  544 Fed. Appx. at 783.

ties to Mexico by that point were minimal.  Additionally, Moreno-Gomez's work history before incarceration appears significant; he had worked 60 hours per week at two jobs.

As described above, Moreno-Gomez's unique circumstances establish an evidentiary basis on which § 212(c) relief could have been granted.  With that, he has shown prejudice from the due process violation.  Accordingly, the court concludes that the 1996 deportation order was fundamentally unfair.

### B. Moreno-Gomez Exhausted Administrative Remedies and was Deprived Judicial Review

Moreno-Gomez must also demonstrate he exhausted administrative remedies and was deprived an opportunity for judicial review in relation to the 1996 deportation order.  He easily satisfies these elements, having shown that the deportation order was fundamentally unfair.  United States v. Vidal-Mendoza, 705 F.3d 1012, 1015 (9th Cir. 2013) (holding that an alien need not separately demonstrate administrative exhaustion and denial of judicial review if the IJ failed to provide information about apparent eligibility for relief).

With that, Moreno-Gomez has shown all that is required for a § 1326(d) challenge to the 1996 deportation order.  The Information must therefore be dismissed.

## IV. ORDER

Moreno-Gomez's Motion to Dismiss the Information (Docket Item No. 18) is GRANTED.  The Information filed on September 2, 2014, is DISMISSED.  The trial and pretrial dates are vacated and the Clerk shall close this file.

**IT IS SO ORDERED.**

Dated:  December 1, 2014



EDWARD J. DAVILA
United States District Judge

10
Case No.: 5:14-cr-00460 EJD
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INFORMATION